# DEFENDANT OCWEN LOAN SERVICING, LLC'S EXPERT REPORT OF JOHN ULZHEIMER IN THE MATTER OF BARTON V OCWEN LOAN SERVICING, LLC IN THE U.S. DISTRICT COURT DISTRICT OF MINNESOTA. CASE NUMBER 0:12-CV-00162

I, John R. Ulzheimer, the undersigned, hereby declare and state the following: I am the president of The Ulzheimer Group, LLC. My business address and telephone number are as follows: 1954 Saxon Valley Circle, Atlanta, Georgia 30319 and (404) 636-3737.

This expert report is based on my 21 plus years of experience and knowledge gained as a professional in the consumer credit industry, specifically as an employee or contractor of Equifax Credit Information Services, Fair Isaac Corporation, Credit.com and Credit.com Educational Services, on my review of relevant documents produced in this matter, and as a result of my previous expert witness work, which is over 125 cases at this point. All of my comments are accurate to best of my knowledge as of the time I drafted this expert report. All of my opinions and comments stated in this report are expressed to a reasonable degree of professional certainty.

## I. SCOPE OF WORK

I have been asked to do the following:

1. Review the documents provided to me by counsel
2. Offer my expert opinions as to the alleged credit damages Plaintiff claims to have experienced
3. Offer other relevant opinions that may be applicable to the facts

## II. QUALIFICATIONS

### A. Employment History

I spent six (6) years with Equifax Credit Information Services and spent several of those years managing a team of consumer service agents, which handled thousands of consumer calls annually. In addition, my team and I handled the process of logging consumers' credit related disputes, the generating of the appropriate dispute forms, manual verification, credit report corrections, and disclosures to consumers. While at Equifax I gained an intimate understanding of how credit files are compiled, stored, retrieved and delivered.

At FICO (formally referred to as "Fair Isaac Corporation" and is best known for its "FICO" credit scores), I spent an additional seven (7) years gaining an intimate understanding of credit scoring, including how credit scores are designed, developed, used by lenders and impacted by the information in consumer credit files. From time to time I was also involved with the development of FICO credit bureau scorecards, which are the heart of the credit scores.





At Credit.com I spent an additional six (6) years working with consumers and the media teaching them how the consumer credit system works including topics such as credit reporting, credit scoring, credit cards and debt settlement, to name a few. I was also the developer of the Credit Report Card, a credit-scoring tool that interprets Trans Union, LLC credit data as a credit-scoring model would and then gives the consumer an easy to understand summary of their credit risk. The tool won several awards in 2009 when it was released.

As a former employee of Equifax, Fair Isaac and Credit.com, I have been exposed to processes and procedures involved in credit reporting, credit report dispute resolution practices, Fair Credit Reporting Act compliance, credit score model design and development, and consumer credit risk management practices.

I am also familiar with general underwriting practices, including what lenders consider to determine credit risk. This includes general opinions that lenders have regarding what they consider to be important and not important from a consumer's credit report. I gained this knowledge from my many years of working with lenders at my time with Equifax, Fair Isaac and Credit.com. In fact, the first four years of my time at Fair Isaac I spent working with the mortgage community teaching them how to properly implement credit scoring into their processes. Fannie Mae and Freddie Mac had just mandated the use of FICO scoring in their desktop underwriting systems, Loan Prospector and Desktop Underwriter. My role, among other things, was to teach industry trade associations, large national mortgage lenders, Fannie Mae, and Freddie Mac how FICO scoring worked, how consumer risk changed as deal variables changed, and how to educate their homebuyer customers on the importance of solid credit management.

**B. Presentations/Academia**

I have made no less than 500 credit reporting and/or credit scoring presentations during my time in the credit industry. These presentations were of varying levels of complexity and were delivered to consumers, consumer groups, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, members of Congress, and banking authorities.

I guest lecture, on an ongoing basis, about credit reporting and credit scoring at The University of Georgia and The Westminster Schools, which are located in or near Atlanta. I have also taught at Emory University's Center for Lifelong Learning in Atlanta. At Emory I was the top rated instructor in the Personal Finance and Investments category for the 2005/2006 term based on student feedback. And finally, I volunteer my time to teach credit reporting and credit scoring fundamentals to members of the Georgia Consortium on Personal Financial Literacy.

I have a BS in Criminal Justice from the University of West Georgia, June 1991, and I am well qualified to interpret and discuss the issues at hand in this case. My background and qualifications are further described in my CV, attached hereto as Exhibit A.

**C. Publications**

I am a frequent contributor on the topics of consumer credit issues, advice and analysis for various media outlets including USA TODAY, New York Times, Los Angeles Times, CNN.com, Washington Post, Money Magazine, American Banker, Chicago Tribune, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, Bankrate.com, and other regional business and consumer media. I have also written books and training manuals on the same including *You're Nothing but a Number* and my most recent, *The Smart Consumer's Guide to Good Credit*. I am published, on average, 1.5 times each business day.

Within the past ten years I have written books and training manuals on the topic of credit reporting, credit scoring and identity theft. They are as follows:

- *You're Nothing but a Number*
- *The GetCreditWise Tool Kit*
- *Surviving Identity Theft*
- *The Smart Consumer's Guide to Good Credit*

I have also written articles and blogs on the same topics for the following:

- Credit.com's monthly e-newsletter, *Tidbits* – The article, which was called "AskJohn", was published each month by Credit.com.

- Boardroom, Incorporated's monthly newsletter, BottomLine Personal – I write an occasional article for Boardroom, which is published in their BottomLine Personal newsletter.

- CreditBloggers.com – I used to blog occasionally for Credit.com's blog site, CreditBloggers.com.

- Credit.com proper – From 2006 through 2010 I wrote countless articles and consumer alerts that were published by Credit.com on their website or by other companies that syndicated Credit.com's content.

- Enloop.com – I used to write periodically for this website. The topic was usually related to small business credit issues.

- I authored the entire "Credit Scoring Background" section on Wikipedia in 2010[1].

- CNBC.com – I used to write periodically about consumer credit and answer viewer emails, both which were published at CNBC's website.

---

[1] Because Wikipedia is subject to user-edits, the current version of this site may contain edits or opinions that I did not author and with which I do not necessarily agree.

- Bank and Lending Liability Report – CARD Act, the good the bad and the meaningless, March 2010.
- IMS Expert Services Newsletter – Published periodically two years ago
- New York Times – I have been a blogger on credit score and identity theft topics for the New York Times. They published numerous blogs of mine during 2009 and 2010.
- Mint.com – I have been published every Monday at Mint.com since July 2010.
- SmartCredit.com – I am published almost daily on SmartCredit's blog.
- CreditSesame.com – I am published four times a month on CreditSesame's blog.
- National Foundation for Credit Counseling – I am published periodically on the NFCC's Financial Blog.
- Credit Card Insider – I am published three times per week on their blog.
- Sky Rocket Media – I am published four times per month on their blog

**D. Certifications**

I am twice FCRA (Fair Credit Reporting Act) certified by the credit reporting trade association, the CDIA (Consumer Data Industry Association), and its predecessor, the ACB (Associated Credit Bureaus).

**E. Previous Expert Witness Work and Testimony**

I have been an expert witness in over 125 credit related lawsuits serving on the sides of both Plaintiffs and Defendants and have been admitted as an expert in both Federal and state courts.

I have testified at trial or depositions in the following cases within the past four years:

Salers v UniFund – Deposition (Birmingham, AL Civil Action No. CV 2008-000034)

Gamby v FNBO – Deposition, Trial (USDC Eastern MI, 2:06-CV-11020

Massey v Ly – Trial (DC of Harris Co, TX No. 2007-74587)

Cartwright v Experian – Deposition (USDC Cent Dist of CA CV09-00427GHK)

Peck v Dua – Deposition (Michigan Circuit CT, No: 08-1456NM)

Nash v Sadek, Inc – Deposition (Superior CT of CA, Co of LA, BC 390316)

Pennington v AFNI – Deposition (Eastern Dist of VA 1:09CV00893)

FUNB v Indian River – Deposition (17th Circuit Ct Florida, 01-00661)
Cooper v Wells Fargo – Deposition (USDC Northern Dist of AL CV08-RRA1170S)
DeWitt v Monterey Ins – Deposition, Trial (San Diego Sup Ct No: 37-08-00079852)
Ortiliza v Mathey – Deposition (Superior CT of WA, King Co. 09-2-11015-8SEA)
Henderson v Chase – Deposition (Superior CT, State of AZ CV2009-054599)
Failla v BB&T – Trial (Forsyth Co. State Ct, GA, 09-sc-1633)
Scott v GMAC – Deposition (USDC, West Dist of VA 3:10-cv-24-NKM)
Beachley v PNC Bank – Deposition (Circuit CT, Frederick Co, MD C 10 2031)
Uplinger v Rees Broome – Deposition (USBC, East Dist of VA 10-01325-RGM)
Jones v GMAC – Deposition, Trial (Sup Ct of CA, Santa Clara Co 107cv082742)
Panitz v Central Mortgage – Deposition, Trial (Sup Ct of CA, Los Angeles YC060960)
Pieri v SunTrust Mortgage – Deposition (127th Dist Ct of Harris Co, TX 10-58560)
Kenny v Safeco Insurance – Deposition, Trial (Sup Ct of WA, Skagit Co 01-2-01600-1)
Chang v Everhome Mortgage – Deposition, Trial (Sup Ct of CA, 30-2010-433519)
Levy v Chase – Deposition (Sup Ct of CA, Los Angeles, West District, BC429088)
Spain v GEMB – Deposition (Superior Court, North Carolina, Pitt County 10CVS2180)
Bibolotti v AHMSI – Deposition (Dist Ct of East Dist of TX, 4:11-cv-00472)
Purscell v TICO Insurance – Deposition (USDC West Dist of MO, 2:12-cv-04039)
Moriarty v Moriarty – Trial (Bergen Co Superior Ct, Hackensack NJ)
Patriot Insurance v McReynolds – Deposition (USDC N. Dist of GA 1:12-cv-0997)

## III. COMPENSATION

I am being paid $350 per hour for all work performed except for testimony. My rate for providing testimony is $375 per hour. These are typical hourly rates for my services.

## IV. DOCUMENTS REVIEWED

Prior to and during the preparation of this report I reviewed several documents. A list of said documents is below, in no particular order:

Complaint
Experian Credit Report for Kate Barton Dated 1/11/12
Plaintiff's 26(a)(1) Initial Disclosures
Plaintiff's Amended Rule 26(a)(1) Initial Disclosures
Plaintiff's Answers and Responses to Discovery Requests
Ocwen Documents Bates Stamped Ocwen 522-529
Memorandum Opinion and Order

Experian's Responses to Subpoena from Plaintiff Bates 001-105
Plaintiff's Deposition Transcript

## V. COMPLETE STATEMENT OF ALL OPINIONS AND BASIS FOR OPINIONS

### A. Background Regarding the Credit Reporting Industry

#### i. Credit Reporting Agency Background

A credit report is a record of an individual's current and past liability experience. The report includes information about a consumer's personal identity, their employment, collection agency accounts (if any), public records (liens, judgments and bankruptcies only), as well as their account history (also called "trade"). One or more of a variety of companies, which maintain a credit file on a consumer, generates the credit report when requested by a lender, insurance company, the consumer, or another organization with a legal right to view the data.

These companies are called credit-reporting agencies, consumer reporting agencies or credit bureaus. They collect, store, and then deliver the credit report in response, normally, to a request from a lender or insurance company who has received an application. There are three primary companies in the United States that act as the national credit bureaus: Equifax, Inc., Experian Information Solutions, and Trans Union, LLC. Equifax is headquartered in Atlanta, GA and is a public company. Experian has its U.S. headquarters in Costa Mesa, CA and is not a public company in the United States. Trans Union is headquartered in Chicago, IL and is privately held. These three companies each maintain roughly 200 million credit files.

#### ii. Preparation of Credit Reports

A credit report is normally delivered to the lender, insurance company or other requesting party when a consumer makes applications for some sort of benefit, such as a home loan, credit card or insurance. The lender, who has an account with the credit bureau, submits a request for the consumer credit file. The credit bureau, using proprietary search logic, compiles the credit report from its vast database. This process is virtually instantaneous, which allows for lenders to make instant credit decisions.

The information in a consumer credit report can be scored using a sophisticated algorithm called a credit-scoring model. That information is then used by lenders to determine an individual's credit risk. The lender subsequently approves or denies the request for credit, and/or sets the terms of repayment using this data. The information in a consumer credit report is not "real time," meaning it is not updated dynamically. This causes the data on a credit report to be roughly 30 days old at any given time.

#### iii. Credit Scoring

A credit score is a number that summarizes an individual's credit risk, based on a snapshot of his or her credit report at a particular point in time. A credit score helps lenders evaluate an individual's credit report and estimates his or her likelihood of paying

90 day late on any credit obligation in the subsequent 24 months after the score is calculated. The most widely used credit scores are FICO scores, the credit scores created by the company, FICO. Lenders can buy FICO scores from all three of the major credit reporting agencies. Lenders use FICO scores to help them make billions of credit related decisions every year. FICO develops its scores based on information in consumer credit reports maintained at the credit reporting agencies. A credit score influences the credit that is available to the consumer and the terms (interest rate, credit limits) that lenders offer to the consumer.

Credit scores are determined differently scoring model by scoring model but in general the FICO scoring system is the United States', Canadian and indeed global standard in countries that have a sophisticated credit reporting system.

### a. Factors Affecting Credit Scoring

Summary of the FICO credit scoring composition

- 35% - Payment History: Negative information on a credit report
- 30% - Debt: How much and what type
- 15% - Length Of Credit History: How long an individual has had credit
- 10% - Credit Diversity: The variety of credit experiences an individual has had
- 10% - Inquiries (hard): When an individual's credit report is accessed

**Payment history (35%** contribution on the FICO scale) - A record of negative information can potentially lower a consumer's credit rating or score. In general, risk scoring systems look for any of the following negative events: charge offs, collections, late payments, repossessions, foreclosures, settlements, bankruptcies, liens, and judgments. Within this category FICO considers the severity of the negative item, the age of the negative items and the prevalence of negative items. As a general rule, having no severely negative credit entries[2] is best, having one is poor, and having two or more is worst.

**Debt (30%** contribution on the FICO scale) - This category considers the amount and type of debt carried by a consumer as reflected on his or her credit reports. There are three types of debt considered.

> **Revolving debt** - This is credit card debt, retail card debt and some petroleum cards. And while home equity lines of credit have revolving terms the bulk of debt considered in this category is true unsecured revolving debt incurred on plastic. The most important measurement from this category is called "Revolving Utilization", which is the relationship between the consumer's aggregate credit card balances and the available credit card limits, also called "open to buy." This is expressed as a percentage and is calculated by dividing the aggregate credit

[2] In the FICO scoring system a severe delinquency is anything that is currently past due, historically 90 days past due or worse, a public record, a collection, or any account status or narrative the indicates default or severe delinquency.

card balances by the aggregate credit limits and multiplying the result by 100, thus yielding the utilization percentage. The higher that percentage, the lower an individual's score will likely be. This is why closing credit cards is generally not a good idea for someone trying to improve their credit scores. Closing one or more credit card accounts will reduce an individual's total available credit limits and likely increase the utilization percentage unless the cardholder reduces their balances at the same pace.

**Installment debt** - This is debt where there is a fixed payment for a fixed period of time. An auto loan is a good example as an individual generally makes the same payment for 36, 48, or 60 months.

**Open debt** - This is the least common type of debt. This is debt that must be paid in full each month. An example is any one of the varieties of credit cards that are "pay in full" products. The American Express Green card is a common example.

**Time in file** (Credit File Age) (**15%** contribution on the FICO scale) - The older an individual's credit report the more stable it is, in general. As such, an individual's score should benefit from an old credit report. This "age" is determined two ways: the age of the credit file; and the average age of the accounts on the credit file. The age of the credit file is determined by the oldest account's "date opened", which sets the age of the credit file. The average age is set by averaging the age of every account on the credit report, whether open or closed.

**Account Diversity** (**10%** contribution on the FICO scale) – An individual's credit score will benefit by having a diverse set of account types on his or her credit file. Having experience across multiple account types (installment, revolving, auto, mortgage, cards, etc.) is generally a good thing for an individual's scores because the individual is proving the ability to manage different account types.

**The Search for New Credit** (Credit inquiries) (**10%** contribution on the FICO scale) – An inquiry is noted every time a company requests some information from a consumer's credit file. There are several kinds of inquiries that may or may not affect one's credit score. Inquiries that have no effect on the creditworthiness of a consumer (including the so-called "soft inquiries"), can remain on credit reports for as little as 6 months and are never visible to lenders or credit scoring models, are:

- Prescreening inquiries where a credit bureau may sell a person's contact information to an institution that issues credit cards, loans and insurance based on certain criteria that the lender has established.
- A creditor also checks its customers' credit files periodically. This is referred to as Account Management, Account Maintenance or Account Review.
- A consumer can check his or her own credit report without impacting creditworthiness. This is referred to as a "consumer disclosure" inquiry.
- Employment screening inquiries.

- Insurance related inquiries.
- Utility related inquiries.

Inquiries that can have an effect on the creditworthiness of a consumer, and are visible to lenders and credit scoring models (also known as "hard inquiries"), are made by lenders when consumers are seeking credit or a loan. Hard inquiries can, but rarely, affect the borrower's credit score.

**b. Scoring Models**

**(I) Multivariate Systems**

Credit scoring models are what are referred to as multivariate, meaning they evaluate a variety of information on a credit report to generate a final score rather than simply one item. No one credit item determines an individual's numeric credit score. In fact, the impact any one item is going to have on an individual's credit score is dependent on the other items on his or her credit report as well as what scoring environment (See Multi-Scorecard Systems below) is used to generate the consumer's final score.

**(II) Multi-Scorecard Systems**

Credit Scoring models are actually the consolidation of a multiple credit scoring systems called scorecards. A scorecard is a credit-scoring model designed to evaluate the risk of a group of consumers who have certain credit file similarities (homogenous populations). For example, a consumer with a bankruptcy on his or her credit report would be scored in a model or scorecard designed specifically to evaluate the credit risk of a consumer who had filed bankruptcy. Another example is a consumer with a very limited amount of credit information (also known as a "thin file"). Most credit scoring systems have many scorecards, as there are many unique consumer profiles, each with different risk levels. An individual's credit file is normally only scored using one scorecard. The selection of the appropriate scorecard is made by the credit scoring system prior to rendering a final score by first evaluating the credit file and determining which scorecard is the most appropriate selection.

**(III) Characteristics, Variables and Weights**

Each scorecard (as described above) contains a series of characteristics, variables and weights. A characteristic, as defined in a credit-scoring context, is a question asked of the credit report by the scoring system. For example, "how many accounts with a balance are present" is a common characteristic in most credit risk models. Other examples include:

- Does the consumer have any delinquencies on their credit report?
- How long has it been since the consumer's most recent delinquency?
- Does the consumer have a bankruptcy on their credit report?

Each of these examples is a plain English rendering of a technical process, meaning the credit scoring system can read the credit report in a machine-readable environment. There are almost always at least 12 and generally more characteristics in each scorecard.

Each of the characteristics has what is referred to as a variable. A variable, in a credit-scoring context, is the series of available answers to the characteristics (questions). Using the above example of characteristics a set of example variables could be (in parentheticals):

- Does the consumer have any delinquencies on their credit report? (Yes/No)
- How long has it been since the consumer's most recent delinquency? (Less than 24 months ago/More than 24 months ago)
- Does the consumer have a bankruptcy on their credit report? (Yes/No)

The above example is overly simplified and meant to visually illustrate the relationship between characteristics and variables. Most characteristics have a much longer list of variable options.

Once the credit scoring system has completed the process of selecting the scorecard and calculating the proper variable to the characteristics of the scorecard then the model assigns weights or points accordingly. For illustrative purposes the assignment of points might work as follows:

- Does the consumer have any delinquencies on your credit report? (Yes) 0 points awarded out of a possible 100.
- How long has it been since the consumer's most recent delinquency? (Less than 24 months ago) 25 points awarded out of a possible 75.
- Does the consumer have a bankruptcy on their credit report? (No) 50 points awarded out of a possible 50.

Once the model has assigned weights/points to each variable, they are tabulated and a final score has been determined. The process described above is performed by computerized systems, and usually is accomplished very quickly. The score is appended to the credit report and delivered to the lender for its use in risk management processes.

### iv. How The Data is Used – Risk Based Pricing

Risk-based pricing is a process used by creditors, insurance companies, landlords, retailers, and utility companies ("data users"). It is the process whereby the data users attempt to measure the downside financial risk of doing business with a consumer versus how much can be made if the product is priced appropriately. For example, if a consumer is a low risk consumer then a lender can be more aggressive with its loan pricing because it is more comfortable that the consumer will pay it back in time.

Alternatively, if a consumer is higher risk then the lender may avoid them altogether or charge them a higher interest rate in order to subsidize the risk posed by the consumer.

Credit reports and credit scores have become synonymous with credit risk and risk based pricing. It would be highly unusual for a lender to grant any sort of credit or set financial terms without a review of the applicant's credit reports and credit scores. FICO scores, which have been largely available to lenders since the late 1980s, are the standard risk metric used in the United States, although other credit scores are used as well.

Other methods of assessing risk, for the purposes of pricing out a loan or insurance policy, are income, loan to value, debt to income, net worth, and property value. Additionally, some lenders might require security on their loans such as down payments or assets to secure property (such as in the case of a mortgage loan or auto loan).

**B. Summary of Opinions**

**i. Opinion – The Plaintiff's credit reports were awash in negative information, which is the real cause of any alleged credit difficulties, credit denials or adverse approvals**

The Plaintiff suggests that Defendant Ocwen's credit reporting somehow damaged her credit reports and credit scores to the point where she was denied credit as a result[3]. She, however, fails to acknowledge that her credit reports were polluted with unrelated and severely derogatory information including a Chapter 7 Bankruptcy filing and some 20+ derogatory accounts, collections and other public records.

The Plaintiff's credit reports indicate the she is of elevated credit risk. Even if you were to remove the credit reporting and the inquiry caused by Defendant Ocwen the Plaintiff would be in the same exact position of being of elevated credit risk.

There were seven (7) credit reports produced for me to review in production of this expert report[4]. Each of those credit reports were awash in negative information including some or all of the following items:

Central Mortgage – 90 days past due
GMAC Mortgage – 30 days late x 2
GMAC Mortgage – included in Bankruptcy
HomeQ – included in Bankruptcy
Saxon Mortgage – included in Bankruptcy
Saxon Mortgage – included in Bankruptcy
Saxon Mortgage – included in Bankruptcy
City and County CU – 120 days past due
CapOne – included in Bankruptcy
Chase BP – Charged off
City and County CU – included in Bankruptcy
City and County CU – included in Bankruptcy

[3] Plaintiff's deposition transcript, page 51, lines 17-18
[4] Experian reports dated 2/28/13, 2/5/13, 1/11/12, 10/26/11, 8/2/11, TransUnion report dated 2/5/13 and an Equifax report dated 2/5/13

HSBC Bank – Charged off
Firestone – included in Bankruptcy
First Financial – included in Bankruptcy
JC Penney – Charged off
CapOne – Charged off
Slumberland – included in Bankruptcy
Anderson Financial - Collection – Dish Network
Ch 7 Bankruptcy – Filed in Oct 2008
AFNI – Collection
Judgment – Filed in 7/08

None of the above referenced derogatory credit entries have anything to do with Ocwen Loan Servicing but all of them are considered to be serious derogatory entries and can lead to a lower credit score. These aforementioned derogatory entries, in aggregate, are the cause of the Plaintiff's poor credit reports, poor credit scores, and elevated credit risk. They are also the apparent reason she has been denied credit. Without the Ocwen credit reporting, the Plaintiff's credit scores would be no different. To that end, Ocwen played no role in the Plaintiff's poor credit scores.

**ii. Opinion – The Plaintiff's alleged credit difficulties, credit denials or adverse approvals were not at all caused by Defendant Ocwen Loan Servicing**

The Plaintiff has produced several "notices of adverse action", informally referring to as declination letters[5]. Each of these letters identifies, at a high level, the reasons the lender chose to deny the Plaintiff's credit applications, which is ubiquitous in these types of communication. These notices are a Fair Credit Reporting Act requirement when a credit report is used as a basis for a credit denial or adverse approval.

The first, a notice from Fifth Third Bank, identifies that on or shortly before September 18, 2011 they denied the Plaintiff for an auto loan because of "Insufficient credit experience since bankruptcy, serious delinquency and derogatory public record or collection filed, and the number of accounts with delinquency" as identified on her Equifax credit report. None of these reasons identify Defendant Ocwen in any way. Further, all of these reasons are a valid byproduct of defaulting on credit obligations and filing for bankruptcy protection. Her credit score as of this time was 613 according to the letter. A 613 places the Plaintiff in the lowest scoring 22nd percentile nationally. Blaming credit inquiries, the least valuable component of credit scoring evaluations, is misguided. As explained above in my page 7, derogatory entries and otherwise negative information (like those listed in B (i) above) are the driving factor leading to the Plaintiff's lower credit scores, and as a result, Plaintiff's denial of credit by Fifth Third Bank.

The second declination letter is from Capital One dated 9/20/2011 and suggests the Plaintiff was denied an auto loan because of "too many delinquent past or present

[5] Plaintiff's 0019-27

mortgage credit obligations." The credit report pulled by Capital One was generated by Experian, as evidenced by the Capital One credit inquiry on the Plaintiff's 10/26/2011 credit report produced in discovery.

The Plaintiff's credit report at the time she applied with Capital One (on or shortly before 9/20/11) contained some 19 derogatory credit entries, including five (5) separate and distinct mortgage entries that showed some level of delinquency. To suggest that Capital One somehow chose only the Ocwen entry and ignored the other four derogatory credit entries as their basis for denial is not only incorrect but suggests a lack of understanding of how credit report data is evaluated by lenders for the purposes of risk assessment. When a credit report is pulled, all of the information on the report is considered, not just one or two items. To that point, there are some 22 derogatory credit entries on the Plaintiff's credit reports. To suggest that lenders did or will focus solely on one Ocwen credit inquiry or account is, again, misguided.

The third declination letter is again from Capital One dated 9/28/2011 and the primary reason for the credit denial is the same as in the Capital One letter dated 9/20/11, which isn't a surprise considering it's only eight (8) days later and it's unlikely that Capital One would have changed their underwriting guidelines in that eight day period.

Having said that, the 9/28/11 letter from Capital One again suggests the Plaintiff was denied an auto loan because of "too many delinquent past or present mortgage credit obligations." And, again, the credit report pulled by Capital One was generated by Experian, as evidenced by the second Capital One credit inquiry on the Plaintiff's 10/26/2011 Experian credit report produced in discovery. The credit score at this time was 536, which is in the lowest 8th percentile nationally.

The last declination letter produced is a letter dated 10/4/11 by Ally Financial to Kate Barton but on behalf of the applicant, Eric McCorkle. I'm not exactly certain why a declination letter for Eric McCorkle is being introduced as evidence of damage suffered by Kate Barton but regardless, Ally Financial denied Mr. McCorkle's application because of the considerably poor credit report produced by Equifax for his co-applicant Kate Barton and her particularly poor credit score at Equifax of 625.

Ms. Barton's 625 credit score, which is in the lowest 24th percentile nationally, is being caused, according to the Ally Financial declination letter, by "Serious delinquency, derogatory public record or collection filed, number of accounts with delinquency, proportion of balances to limits being too high, and the length of time since derogatory public records or collection is too short." These explanations are commonly referred to as "score factors", and they are the top four reasons why the consumer's score was not higher. These score factors/explanations are neither related to an Ocwen credit inquiry nor an Ocwen account. In fact, even if the Ocwen trade line and the Ocwen inquiry never existed, the factors influencing the Plaintiff's scores would be exactly the same.

The bottom line is this; the Plaintiff's credit reports are loaded with negative information and her credit scores are very low and indicate serious credit risk. That's the reason she

has been denied credit or has been approved with poor terms. The fact that she had a credit inquiry and a trade line from Ocwen mortgage on her credit report is meaningless and did not cause her any credit difficulties, as I stated in my Opinion #1. Further, the Ocwen account was and is accompanied by so much other unrelated seriously derogatory credit information that even in its absence the Plaintiff would still experience credit difficulties, including credit denials and adverse approvals.

It is my understanding that discovery continues in this case. As such, I reserve the right to supplement or amend my opinions as discovery continues, depositions take place and subsequent expert reports or other or additional documents are submitted. I declare that the foregoing is true and accurate to best of my ability based on the documents I have reviewed, my education, my experience, my training and expertise and that this Expert Report was signed in Atlanta, Georgia on May 31, 2013.

/s/ John R. Ulzheimer

AVIS H. WILLIAMS NOTARY PUBLIC Exp. Aug. 22, 2016 COBB COUNTY, GA

5/31/13

# Exhibit A

# John Ulzheimer Bio and CV

John Ulzheimer, President of The Ulzheimer Group, LLC and Founder of www.creditexpertwitness.com, is a nationally recognized expert on credit reporting, credit scoring and identity theft. In addition, his expertise includes FDCPA, FCRA, CROA, credit report damages and the resulting economic damages. He serves as an expert witness/legal consultant for those involved in credit related litigation and has been qualified and admitted as an expert in Federal and State court.

John is twice FCRA certified by the Consumer Data Industry Association (the trade association of the credit reporting agencies) and has 21+ years of experience in the consumer credit industry including positions with Equifax Credit Information Services (6 years), Fair Isaac, which is the inventor of the FICO® credit scoring system (7 years), Credit.com (6 years), and currently SmartCredit.com (~2 years).

John is the credit blogger for Mint.com, SmartCredit.com, CreditSesame.com, CreditCardInsider.com, and the National Foundation for Credit Counseling. John has been published and quoted over 2,000 times in the past 5 years on the topic of consumer credit. He has authored or created numerous educational materials on the subject including:

- The book, *The Smart Consumer's Guide to Good Credit*
- The book, *You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies.*
- The consumer handbook, *Surviving Identity Theft.*
- The consumer handbook, *The GetCreditWise ToolKit*
- The white paper, *Common Mistakes Made by Ineffective Credit Expert Witnesses.*
- The article, *Top 10 Ways to Survive a Deposition*

**Relevant Experience at Equifax** – Managed consumer dispute process including consumer interview, logging consumer dispute onto credit report, communicating with data furnisher to validate credit file accuracy, modified consumer credit report according to results of investigation, and communicate dispute resolution results to consumers.

Managed relationship between Equifax and thousands of small customers, such as credit unions, car dealerships, banks, and collection agencies. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, credit scores, fraud detection services and data access software.

Managed relationship between Equifax and large strategic clients based in Jacksonville, Florida including large regional bank and national credit card issuer. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, and credit scores.

**Relevant Experience at Fair Isaac** – Supported all of Fair Isaac's credit bureau based scores sold by North American credit reporting agencies; Equifax, Equifax Canada, Trans Union, Trans Union Canada, and Experian. Managed credit score pricing for several years. Well versed in credit score validations, impact analyses, score migration

studies, credit scorecard development and what influences credit scores. Performed hundreds of credit score trainings to audiences of all levels of sophistication including lenders, credit bureaus, members of Congress, consumer groups and consumers.

John frequently appears on CNBC, FOX News, CNN and Oprah's "Oprah and Friends" XM Satellite Radio. He has contributed content for CNBC's "On The Money", Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show. He is also a frequent commentator on credit-related issues in various outlets including USA TODAY, Associated Press, CNBC, NPR, Los Angeles Times, CNN, FOX, Washington Post, Money Magazine, American Banker, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, The Motley Fool, Chicago Tribune, Bankrate.com, and other regional business and consumer media.

In his hometown of Atlanta, John is regular guest lecturer at The Westminster Schools, The University of Georgia and the Georgia Consortium for Personal Financial Literacy. Between 2004 and 2007 John taught a course on credit reporting and scoring at The Emory University Center for Lifelong Learning and was named by the students the Top Personal Finance and Investments Instructor for the 2005/2006 term.

---

**Certifications**

**FCRA Certified – Consumer Data Industry Association - 2011. Perfect score on certification test.**

**Associate Credit Executive – International Credit Association. 1997.**

**FCRA Certified – Associated Credit Bureaus - 1992.**

**Consumer Credit Interviewer – Designation Conferred by Equifax as part of their employee training program.**

---